IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

JOHN WAYS,

                    Petitioner,

     vs.

DAVID E. ORTIZ and THE DISTRICT
COURT OF THE UNITED STATES FOR
THE DISTRICT OF NEBRASKA,

                Respondents.

**4:20CV3086**

**MEMORANDUM AND ORDER**

       Pending before me are a series of prolix and confusing documents containing over a hundred pages that Mr. Ways ("Ways") apparently asks me to consider together. (Filing nos. 1-5.) Ways claims that he is entitled to a writ of error *coram nobis* under the All Writs Act, 28 U.S.C. § 1651(a). *See United States v. Morgan*, 346 U.S. 502, 506 (1954).

       After initial review,[1] I will dismiss this case. My reasons follow.

### *The Law*

       The Eighth Circuit has explained the extremely limited nature of this writ. *See, e.g., Baranski v. United States*, 880 F.3d 951, 954 (8th Cir. 2018) ("*Coram nobis* relief has been called the criminal-law equivalent of the Hail Mary pass in American football.

---

      [1] Although this is akin to, but not technically, a § 2255 action, it makes sense to look to Rule 4 of the *Rules Governing Section 2255 Proceedings for the United States District Courts* for guidance. Among other things, Rule 4(b) provides for initial review by the judge and states that "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion . . . ."

*United States v. George*, 676 F.3d 249, 251 (1st Cir. 2012). There is good reason for this reluctance. 'The further a case progresses through the remedial steps available to a criminal defendant, the stiffer the requirements for vacating a final judgment. . . . The writ of error coram nobis lies at the far end of this continuum.' *Id.* at 258."); *Willis v. United States*, 654 F.2d 23, 24 (8th Cir. 1981) ("The writ of error coram nobis is an extraordinary remedy designed to correct errors of a fundamental nature" and should not be used to continue litigation after final judgment and exhaustion or waiver of a statutory right of review except where fundamental error has occurred; "The burden is on [the petitioner] to prove some fundamental error was committed.") To put it bluntly, and quoting *Baranski*, Ways is attempting a "Hail Mary pass," but he is no Doug Flutie.

### *Discussion*

First, Ways is presently in federal custody in a case pending before Judge Bataillon where his § 2255 motion regarding ineffective assistance of counsel is awaiting an evidentiary hearing. *United States v. Ways*, 8:12CR391. (The motion can be found in that case at filing no. 755.) He is currently serving thirty-six (36) months on Count I, one hundred eighty (180) months on Count II, and one hundred eighty (180) months on Count III, to run concurrently. He stands convicted of drug and money laundering crimes. (The Amended Judgment, entered on November 10, 2016, can be found in that case at filing no. 716.)

In this case, Ways has named as a Respondent David Ortiz, the person running the prison where Ways is presently confined, under Judge Bataillon's judgment. If he attacks his conviction and sentence in Judge Bataillon's case[2], I lack the authority to give him relief since the case is assigned to Judge Bataillon and not me. Therefore, to the extent Ways seeks relief in Judge Bataillon's case, I will dismiss that portion of this case without prejudice.

---

[2] He apparently does, alleging there is "no lawful Power to hold me in New Jersey." (Filing no. 2 at CM/ECF p. 7.) New Jersey is where he is currently serving the sentence imposed by Judge Bataillon.

2

Next, Ways has appeared before me in another older criminal case. *United States v. Ways*, 4:03CR3046. Thus, I discuss two aspects of that case in relationship to this one because Ways refers to my old case in his rambling complaints and apparently raises both as claims.

During the middle of a jury trial when it became apparent, at least to me, that he would be convicted, Ways entered a plea pursuant to a plea agreement regarding possession of an unlawful destructive device. (Filing no. 96.)[3] Among other things, the plea agreement, filed on March 4, 2004, provides the following:

> (a)   Items seized by federal or state authorities in January, February, April, and August 2003, and in February 2004, which are owned by you, and which are not explosives, destructive devices, or other such prohibited items, and which would be lawful for you to possess will be returned to a third party, whose identity is mutually agreeable to both you and the government, and who will agree to verify to the parties the disposition of all items. All 'launcher' devices will be sold by the third party within six (6) months of today's date.

(*Id.* at CM/ECF p. 1 ¶ 3(a).)

I accepted the plea agreement. I entered a judgment pursuant to and consistent with the Rule 11(c)(1)(C) plea agreement in May of 2004—72 months in prison. (Filing no. 111; Filing no. 114.) With a criminal history category of V and total offense level of 27, the sentence required by the plea agreement was well below the Guideline range of 120 to 150 months in prison. (Filing no. 116 at CM/ECF p. 3.)

No appeal was taken. Ways did not file a § 2255 motion either. Ways is no longer in custody or subject to supervised release because of my judgment.

---

[3] The citations to "Filing no." in the next four paragraphs refer to *United States v. Ways*, 4:03CR3046.

In July of 2007, Ways filed motions which essentially claimed that the government had not disposed of property it was required to handle in accordance with the plea agreement and asked that I review the matter. (Filing no. 124; Filing no. 126.) I denied Ways' claims, and he appealed. The Court of Appeals denied Ways relief, noting that his appeal was untimely. (Filing no. 133; Filing no. 134.) The mandate was issued on October 9, 2007. A subsequent attempt to appeal, on similar grounds, was also denied as untimely, and the mandate was issued on January 11, 2008. (Filing no. 143; Filing no. 144.)

Therefore, to the extent Ways claims a breach of the plea agreement regarding the various items the government took from him, he is not entitled to relief because (a) that matter has, long ago, been finally resolved by the Court of Appeals; (b) in the many pages of material filed in this case, Ways has not shown that there were errors of a fundamental nature sufficient to warrant a writ of error *coram nobis*; and (c) the six-year statute of limitations for return of seized property has long since passed, and he has failed to show an entitlement to equitable tolling by diligently pursuing his rights.[4]

Ways may also claim that he was tricked, defrauded, and threatened by the prosecutor and his defense counsel to enter the plea and plea agreement when he, so he implies, was not guilty.[5] (*See, e.g.*, Case No. 4:20CV3086, Filing no. 4 at CM/ECF pp. 12-15 ¶¶ 25-31.) The basis for this claim is a jumble of confusing accusations and generalizations not supported by any specific factual allegations that can withstand scrutiny when the record is examined. In short, if that claim is made, it is ludicrous.

I held a lengthy colloquy with Ways before I accepted his plea. It took 49 minutes. The transcript is on file in this court. (Case No. 4:03CR3046, Filing no. 99.) I now quote the entirety of the Rule 11 inquiry:

---

[4] *United States v. Mendez*, 860 F.3d 1147, 1149-1151 (8th Cir. 2017).

[5] I was and am well acquainted with both lawyers. I know them to be among the best criminal lawyers in Nebraska who are also known for their sterling ethical reputations.

(Thursday, March 4, 2004, at 3:00 p.m.)

THE COURT: We are now on the record in U.S. versus John S. Ways, Jr., 4:03CR30646. Counsel, have you entered into a petition to enter a plea of guilty and a plea agreement?

MR. EVERETT: We have, Your Honor, and I was just looking over it and signing it and in my haste, the certificate of defense counsel had not been signed, and I signed there by mistake.

THE COURT: Oh, I see. Okay. Why don't you scratch through that, Mr. Mock, if you think it's appropriate, and sign it?

MR. EVERETT: May I bring the petition forward, Your Honor?

THE COURT: Sure. Thank you. Give me a moment, please. I don't see a plea agreement attached here. Is there one?

MR. EVERETT: One was delivered earlier. The original was delivered earlier to your office.

THE COURT: That's the original?

MR. EVERETT: Pardon?

THE COURT: The original was delivered to my office?

MR. EVERETT: Yes.

THE COURT: I have it. Thank you. All right. I understand that Mr. Ways desires to plead guilty to Count II, paragraph 2 of the superseding indictment. Is that true, Mr. Mock?

MR. MOCK: That's correct, Your Honor.

THE COURT: Is that true, Mr. Ways?

THE DEFENDANT: Yes, sir.

5

THE COURT: All right. What I'll next do is ask counsel for the government to advise Mr. Ways of what Count II, paragraph 2 charges and then advise Mr. Ways of what the maximum penalties are, please.

MR. EVERETT: Mr. Ways, Count II, paragraph 2 of the indictment alleges that on or about February 27th, 2003, in the District of Nebraska, that you knowingly received and possessed a firearm, to-wit: 15 explosive projectiles each of which constitute explosive bombs. Projectile construction was similar and each consisted of an explosive projectile that was inserted into a yellow 37mm cartridge case. The explosive projectiles consisted of a quantity of explosives which was confined within a thick cardboard tube sealed at both ends with a wooden plug and a length of pyrotechnic fuse that was inserted into the confined explosives as a means of initiation. The cartridge cases included a primer and an explosive propelling charge. It's alleged, then, that this device was not registered to you in the National Firearms Registration and Transfer Record, in violation of Title 26, United States Codes, Sections 5841, 5861(d) and 5871. The maximum possible penalty, if you are convicted of that offense, is up to ten years imprisonment, a fine of up to $250,000, or you could get both the fine and the imprisonment. There would be a term of supervised release imposed of up to three years following any sentence of incarceration, and there is a mandatory special assessment of $100. Do you understand what you're charged with in Count II, paragraph 2, of the indictment, and do you understand what the maximum possible penalties are?

THE DEFENDANT: Yes.

THE COURT: Mr. Ways, I'll ask you to turn around and speak into the microphone, if you would, sir.

THE DEFENDANT: Yes.

THE COURT: Now, I need to ask you, Mr. Ways, how do you wish to plead to Count II, paragraph 2, of the indictment?

THE DEFENDANT: I'm pleading guilty.

THE COURT: Okay. Mr. Ways, my understanding is that with the assistance of your lawyer, you have filled out a petition to enter a plea of guilty and have signed a plea agreement which is attached to the petition to enter a plea of guilty; is that right?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Before I can accept your guilty plea, Mr. Ways, I have got to be sure what you're doing is knowing, intelligent, and voluntary, and that there is a factual basis for your guilty plea. The way I go about doing that is to ask you a series of questions after you've taken an oath to tell me the truth, so, Mr. Ways, I would like you to raise your right hand and this lady will administer an oath to you. (The defendant was placed under oath)

THE COURT: All right. Mr. Ways, you're now under oath. You're obligated to tell me the truth. If you don't you could be prosecuted for the crime of perjury, and what you tell me now can be used to prove these charges against you. Do you have any questions about any of that?

THE DEFENDANT: I don't believe so.

THE COURT: As you sit here today, do you feel okay.

THE DEFENDANT: No, actually, I feel a little ill, but I'll live.

THE COURT: Well, I understand, obviously, this is a pressure packed situation, but the question I really want to know is, do you feel well enough to proceed today to make an intelligent decision about this matter?

7

THE DEFENDANT: I believe so.

THE COURT: Okay. Now, you've had a high school education; is that right?

THE DEFENDANT: Correct.

THE COURT: And you have never been under the care of a doctor or in a hospital for drug or alcohol treatment for addiction; is that right?

THE DEFENDANT: Correct.

THE COURT: You have been under the care of a doctor or in a hospital -- Well, you were treated -- Pardon me. You weren't treated. You were evaluated at St. Joe's, which is a hospital in Omaha, Nebraska, when you were 15 for a mental or emotional condition; is that right?

THE DEFENDANT: I think it was more of a -- I can't say that that's completely correct.

THE COURT: Give me a sense of what happened.

THE WITNESS: I was -- I had unwisely challenged parental authority as a juvenile, and my parents were making sure --

THE COURT: That everything was okay?

THE DEFENDANT: -- that everything was okay.

THE COURT: So you and your folks went to St. Joseph, and you were evaluated there?

THE DEFENDANT: Correct.

THE COURT: Okay. Aside from that evaluation, is it true that you've never been under the care of a doctor or in a hospital for any mental or emotional condition?

THE DEFENDANT: I believe that would be true.

8

THE COURT: And you're 37 years of age now, sir?

THE DEFENDANT: Yes.

THE COURT: Mr. Mock is your lawyer; right?

THE DEFENDANT: Correct.

THE COURT: Have you had enough time to talk with him?

THE DEFENDANT: There is never enough time to go through everything, but under the circumstances --

THE COURT: Well, I understand that there is never enough time, but are you satisfied that you have had enough time to intelligently proceed today?

THE DEFENDANT: I'm willing to go forward with the procedures today.

THE COURT: Okay.

THE DEFENDANT: My satisfaction is not a question I can really answer to, but I mean, yes, at this time.

THE COURT: Yeah, I mean, he has been representing you during the trial of the case?

THE DEFENDANT: Correct.

THE COURT: You talked to your folks this morning?

THE DEFENDANT: Yes, sir.

THE COURT: Privately?

THE DEFENDANT: Yes, sir.

THE COURT: You talked to Mr. Mock this morning and quite a long time last night, as I understand it. Is that also true? Yesterday?

9

THE DEFENDANT: I believe we spoke yesterday evening, too, yes.

THE COURT: And then you talked to him on and off from 8:30 until, oh, sometime this morning about 11:00, then we came into the courtroom; is that right?

THE DEFENDANT: I believe, yes.

THE COURT: And then -- Actually, it was closer to 10:00, and then we took a break and you have been conferring on and off with Mr. Mock since then; is that fair?

THE DEFENDANT: After the break we primarily filled out paperwork.

THE COURT: Right. You went over the petition and the plea agreement, the written plea agreement with him?

THE DEFENDANT: Yeah.

THE COURT: It's now shortly after 3:00 o'clock in the morning -- in the afternoon, right? At least according to that clock.

THE DEFENDANT: Yes.

THE COURT: Okay. Now, in your petition to enter a plea of guilty, you tell me that you're satisfied with the job that Mr. Mock has done; is that true?

THE DEFENDANT: Correct.

THE COURT: You understand the charges against you?

THE DEFENDANT: I believe so.

THE COURT: You understand you have a right to plead not guilty to every charge?

THE DEFENDANT: Correct.

THE COURT: What I'm next going to do, Mr. Ways, is outline each of the rights you give up when you plead guilty, and then I'm going to ask you if you understand you're giving these up. You have a right to a speedy and a public trial by a jury. You have a right to a lawyer at all stages of the proceeding, and if you couldn't afford to pay for one, I would appoint one to represent you at no cost to you. You have a right to see and hear all the witnesses called to testify against you and the right to cross-examine them. You have the right to use the Court's power to make people come to court to give testimony for you and to produce other forms of evidence. You have the right to take the witness stand or not take the witness stand, as you choose, and you cannot be required to take the witness stand if you don't care to. If you do not take the witness stand, the judge or the jury cannot take that as evidence against you. You have the right to be presumed innocent until and unless the government has proven you guilty beyond a reasonable doubt to the unanimous satisfaction of all 12 of the jury members. Now, Mr. Ways, do you understand if I accept your guilty plea, you will be found guilty of Count II, paragraph 2, and there will not be a trial, and you will have given up the rights that I've just explained to you? Do you understand that?

THE DEFENDANT: Correct.

THE COURT: Now, you'll be pleading guilty to a felony offense, and this will deprive you of valuable civil rights like the right to vote, to hold public office, and to possess a gun. Do you have any questions about any of that?

THE DEFENDANT: Is that in all 50 states that the voting and public office thing, because in some states you can still vote. In some states you can run for office, so that's what I'm --

THE COURT: In general, by pleading guilty to a felony offense, you will be deprived of civil rights in most states such as the right to vote, to hold public office, to serve on a jury and to possess a gun. There are certain federal laws, for example, with regard to possession of a gun, if you have

been convicted of a felony, and the state laws cannot change the federal law. Do you have any questions about any of that?

THE DEFENDANT: I don't believe so.

THE COURT: Okay. Now, you have been advised of the maximum term of imprisonment and the maximum fine, and I want to go over those again with you. You can go to prison in this case for up to ten years, you can be fined up to $250,000 and sent to prison for ten years and required to spend three years of time on supervised release after you get out of prison and be required to pay a $100 special assessment. Do you have any questions about that?

THE DEFENDANT: No, sir.

THE COURT: And there is a minimum three-year period of supervised release that I must impose after any release from prison. Do you understand that?

THE DEFENDANT: My understanding was it could be up to but it didn't have to be the three full years.

THE COURT: That's true. Pardon me. I was incorrect. And up to three years of supervised release is the minimum. Do you understand that?

THE DEFENDANT: Yes. I'm hoping for that.

THE COURT: Well, now, this is a sentencing guideline case, and under the guidelines, the guidelines – well, this is a sentencing guideline case, and if there were no plea agreement that required me to impose a particular sentence, the sentencing guidelines would tell me where in the guidelines I would have to sentence you if you were convicted. Do you have any questions about that?

THE DEFENDANT: I believe I understand.

12

THE COURT: Okay. Under the federal statutes, if I sentence you to a period of time and in prison, you'll do all that time, not a third of it or a half of it, less no more than 54 days a year for earned good time if you earn it. Do you have any questions about that?

THE DEFENDANT: No, sir.

THE COURT: Okay. Let's talk about that period of supervised release. It could be up to three years, and there are three things about that that you have to understand. If you screw up while you're on supervised release, I can send you back to prison. Okay? If you are on supervised release, you aren't a free person, obviously, because your conduct is supervised. And if you are on supervised released, you commit another crime, the punishment for that other crime can be greater. Do you have any questions about that?

THE DEFENDANT: I don't believe so.

THE COURT: All right. Is your plea of guilty and the waivers of your rights made voluntarily and completely of your own choice, free of any force or threats or pressures?

THE DEFENDANT: Yes.

THE COURT: Okay. Now, you've entered into a written plea agreement in this case; is that right?

THE DEFENDANT: Yes, sir.

THE COURT: I'm going to ask the government's lawyer to summarize that written plea agreement in a minute, and then I'm going to ask you whether his summary is accurate. That written plea agreement is in the form of a letter dated March 4, 2004. Did you sign that document?

THE DEFENDANT: Yes, sir.

THE COURT: Did you discuss it with Mr. Mock before you signed it?

13

THE DEFENDANT: Yes, sir.

THE COURT: Do you think you understand it?

THE DEFENDANT: I believe so.

THE COURT: Okay. Now, I'm going to have the government's lawyer, as I said, summarize the pertinent – well, summarize the major parts of that written plea agreement, and I want you to listen carefully. Counsel?

MR. EVERETT: Your Honor, the major provisions of the plea agreement are as follows: That Mr. Ways agreed to plead guilty to Count II, paragraph 2, of the indictment. If the Court accepts the plea and the plea agreement, the government will at time of sentencing move to dismiss the remaining counts of the indictment. The government agrees that items seized by federal or state authorities in January, February, April and August of 2003, and in February, 2004, which are owned by Mr. Ways and which are not explosives, destructive devices or other such prohibited items and which would be lawful for Mr. Ways to possess, will be returned to a third party whose identity will be mutually agreed upon by both Mr. Ways and the government and who will agree to verify to the parties the disposition of all items. All launcher devices will be sold by the third party within six months of today's date. We further agree no criminal charges will be filed against Mr. Ways pertaining to items found in a storage unit at Aardvark Self-Storage 5800 Arbor Road, Lancaster County, Nebraska, on August 6, 2003. We further agree, no criminal charges will be filed against Mr. Ways or family members pertaining to two firearms recovered from his parents' house on February 26, 2004. The parties tender this plea agreement pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure as follows: Paragraph A, the sentence will include a six-year term of imprisonment; and B, the Court at sentencing will recommend incarceration at the Federal Correctional Facility in Yankton, South Dakota, or at another minimum security facility as close as is possible to Lincoln, Nebraska. The parties understand that this recommendation is not binding on the Bureau of Prisons.

14

The fifth paragraph of the plea agreement states, Mr. Ways has previously registered a machine gun, to-wit: an SWD, Inc., 9 millimeter submachine gun, model M11, serial 15 number 86-0005572. If, prior to sentencing, Mr. Ways surrenders this machine gun to the Bureau of Alcohol, Tobacco, Firearms & Explosives, or if he provides information which results in its recovery by law enforcement authorities, and if there is compliance with all other provisions of the plea agreement, then the parties further tender to plea pursuant to Rule 11(c)(1)(C) as follows: That the sentence will include a five-year term of imprisonment rather than six years as outlined in paragraph 4A. Paragraph 4B pertaining to the recommendation as to the facility will still remain in effect; and those are, I think, the primary provisions of the plea agreement, Your Honor.

THE COURT: Mr. Mock, is that a fair summary?

MR. MOCK: It is.

THE COURT: Mr. Ways, did you hear what the lawyers just told me?

THE DEFENDANT: Yes, sir.

THE COURT: Do you agree with them?

THE DEFENDANT: I'm sorry. Do I agree with them?

THE COURT: Yeah. Do you think their summary is accurate?

THE DEFENDANT: Yeah, that's a fairly accurate representation.

THE COURT: Now, you say in your petition to enter a plea of guilty that your reasons for making the agreement are as follows: Quote, it is my best interest to enter a plea, end of quote.

THE DEFENDANT: Yes, sir.

THE COURT: Is that the reason that causes you to make that agreement?

MR. MOCK: Your Honor, I think that he believes that the plea agreement, under the circumstances, is in his best interest to follow, and that he thereby avoids the risk that would entail in further trying the case.

THE COURT: That's fair. Is what your lawyer told me true?

THE DEFENDANT: Yes, sir.

THE COURT: Now, aside from the promises made by the government in that written plea agreement, has anybody made any other promises other than those promises in the written plea agreement?

THE DEFENDANT: I don't believe so.

THE COURT: Okay. Well, what I need to make clear to you is that nobody can make any promises to you whatsoever except for the promises in that written plea agreement. Do you understand that?

THE DEFENDANT: I understand that.

THE COURT: Okay. My understanding is -- Well, let me ask it to you a different way. Has any judge, officer, attorney, or any agent of any branch of the government made any promises to you of any kind other than those set forth in that written plea agreement?

THE DEFENDANT: No.

THE COURT: Okay. Are you presently under the influence of any kind of alcohol, medicine, or drug of any kind?

THE DEFENDANT: No.

THE COURT: Are you pleading guilty for any reason other than the fact that you are guilty?

16

THE DEFENDANT: I believe I'm pleading guilty because I accepted the letter government's plea bargain and that was the correct thing to do.

THE COURT: Let me ask it to you a slightly different way. In paragraph 42 of your petition to enter a plea of guilty --

THE DEFENDANT: 42?

THE COURT: Yeah. I can't see there, my eyes aren't good enough. Do you have a copy of the petition in front of you?

MR. MOCK: May I approach? We don't have a copy for some reason.

THE COURT: Do you have that in front of you, Mr. Ways?

THE DEFENDANT: Yes.

THE COURT: Okay. In paragraph 42 of your petition, the question is asked, are you pleading guilty for my reason other than the fact that you are guilty?

THE DEFENDANT: No.

THE COURT: And you answered no; is that right?

THE DEFENDANT: Correct.

THE COURT: You want to ask me any questions?

THE DEFENDANT: I do, but can I reserve them for later.

THE COURT: Well, in a minute I'm going to have to decide whether to accept your plea, and if you have questions, I need to have you ask them before I decide whether to accept your plea.

THE DEFENDANT: Then no, I don't have any questions.

17

THE COURT: Okay. Did Mr. Mock go over all of these questions with you before you came to court today?

THE DEFENDANT: Yes.

THE COURT: When he went over them, do you think you understood them?

THE DEFENDANT: I believe so.

THE COURT: Okay. I'm going to ask you some questions now with regard to paragraphs 46 and 47 on page 14. Do you now want to plead guilty?

THE DEFENDANT: Correct.

THE COURT: Are you guilty?

THE DEFENDANT: Yes.

THE COURT: Okay. Now, I want to ask you some questions about paragraph 2 of this indictment, basically of Count II of the indictment. Basically, it says on February 27th, 2003, in Nebraska, you possessed 15 explosive projectiles, each of which -- well, 15 explosive projectiles. The projectile construction was similar and each one consisted of an explosive projectile that was inserted into a yellow 37mm cartridge case. The explosive projectiles consisted of a quantity of explosives which was confined within a thick cardboard tube sealed at both ends with a wooden plug and a length of pyrotechnic fuse that was inserted into the confined explosives as a means of initiation. The cartridge cases including -- included a primer and an explosive propelling charge. That's a long, long allegation, but basically, what I want to know is this: On or about February 27th, 2003, in the District of Nebraska, were you in possession of those devices?

THE DEFENDANT: It's come to my attention that I was, yes.

18

THE COURT: You don't dispute that?

THE DEFENDANT: Not at this point, no.

THE COURT: The government goes on to say that those devices were not registered in the national firearms registration and transfer record. My understanding is you don't dispute that either; is that true?

THE DEFENDANT: Correct.

THE COURT: Now, in your petition to enter a plea of guilty, you say in paragraph 47. You want to look at that now?

THE DEFENDANT: Yes.

THE COURT: I may have misjudged the legality of certain products that I had in my possession, and that's what causes you to think that you're guilty?

THE DEFENDANT: Correct.

THE COURT: Okay. Essentially, what I understand you to be saying is you now understand that a mistake of law or ignorance of law in this case is not a defense.

THE DEFENDANT: Correct.

THE COURT: Okay. I obviously have had some better education about the facts of this case because I was listening to the evidence as it was being presented. Were these projectile devices at a place called Mataya's.

THE DEFENDANT: No, they weren't.

THE COURT: Where were they?

THE DEFENDANT: They were at a place called Mataya's Babydolls. Either people are intentionally misreading the name, or they are trying to be just out and out repulsively

19

rude, but, yeah, some people calling it one thing and some people calling it another.

THE COURT: Give me the pronunciation again.

THE DEFENDANT: Mataya, exactly as it's spelled, M-a-t-a-y-a, Mataya's.

THE COURT: All right. Was it at Mataya's, were these projectiles?

THE DEFENDANT: I believe so.

THE COURT: And that's at roughly 5600 Cornhusker here in Lincoln?

THE DEFENDANT: Correct.

THE COURT: Okay. And you were the -- managing Mataya's at that time?

THE DEFENDANT: I'm a major stockholder of the corporation that runs Mataya's Babydolls Gentleman's Theater Club.

THE COURT: You were in and out of there.

THE DEFENDANT: I was in and out.

THE COURT: On or about the date set forth in the indictment?

THE DEFENDANT: Hold on just one second.

THE COURT: Sure.

THE DEFENDANT: You mean on or about the day in question?

THE COURT: Yes, I do.

THE DEFENDANT: Yes.

THE COURT: Now, in the plea agreement, the government promises not to prosecute -- Well, let me be specific here. In the plea agreement the government says that no charges will be filed against you or your family pertaining to two firearms recovered from your parents' home on February 26, 2004. Mr. Ways, do you recall that provision?[6]

THE DEFENDANT: Yes, sir.

THE COURT: Okay. I need to make certain and I don't mean to accuse your parents of anything, but I need to make certain that you are pleading guilty because you think it is in your best interests. Is that why you're pleading guilty?

THE DEFENDANT: I think its -- Yes. Family is strong.

THE COURT: No, I understand that you may have an interest in seeing that your parents aren't prosecuted.

THE DEFENDANT: And I didn't know anybody would even think to try to prosecute my parents for something that the police returned to them, so I mean, that was just news to me that I heard today.

THE COURT: Okay. But I need to be sure that you're doing this because you think that it is in your best interests.

THE DEFENDANT: Yes.

THE COURT: Okay. Now, do you understand that if I accept this plea agreement, it is in the nature of a plea agreement in

---

[6] Sadly, when he was 16, Ways twice allegedly threatened to kill his mother (once with an ax) and was institutionalized as a result. But his parents were supportive of him despite having four other children, one of whom was adopted. Ways' father was a Lincoln, Nebraska, police officer for 31 years before he retired due to a back injury and then went to work for the Nebraska Department of Highway Safety. Mrs. Ways was employed as well. Neither had any criminal history. (Case No. 4:03CR3046, PSR, Filing no. 54 at CM/ECF p. 14 ¶ 55 and CM/ECF pp. 22-23 ¶¶ 96-100.)

a requires me to impose a specific sentence either six years in prison or five years in prison depending upon whether at the time of sentencing you have given the government the required information about the machine gun. Do you understand that that is what the plea agreement requires of me?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Now, again, do you have any questions you want to ask me?

THE DEFENDANT: Is it my understanding that you can, on the supervised release, go anywhere from one day to three years or anywhere there in between?

THE COURT: Well, I can, I can, but what will happen is under the guidelines, the guidelines will give me a range.

THE DEFENDANT: I thought with this particular proceeding, you could do as you saw fit.

THE COURT: Not on the supervised release as I understand the plea agreement. I'll be required to sentence you on the period of supervised release by whatever the range would typically be under the guidelines.

THE DEFENDANT: Oh. Okay.

THE COURT: Any further questions?

THE DEFENDANT: I don't believe so.

THE COURT: All right. Now, Mr. Ways, do you want me to accept your plea and your plea agreement?

THE DEFENDANT: Please.

THE COURT: Okay.

THE COURT: Mr. Everett, do you want me to ask Mr. Ways any more questions?

MR. EVERETT: No. I don't know, I don't know if you feel like you've heard enough information for a factual basis, if you want anything more from me on that, but I don't have any more questions to ask of Mr. Ways.

THE COURT: Well, I'm satisfied that what Mr. Ways said he was in possession of violated the law and that he did not dispute the lack of registration, but I'll be perfectly happy to hear a brief summary about the factual basis understanding that I have sat through a number of days of trial now.

MR. EVERETT: Right, and the primary issue I was concerned about, Your Honor, is whether the Court is satisfied that you've got enough information to conclude that these 15 explosive projectiles constitute destructive devices within the meaning of the statute, and I can provide some additional information on that.

THE COURT: I have seen them or pictures of them. I have seen the stipulation of lack of registration in the trial of this matter. I think they, as alleged, fit the definition, but go ahead and add whatever you want to add briefly.

MR. EVERETT: Judge, I think I would just like to add if the case, if the trial had continued, the government would have presented evidence that these items have been examined, they were X-rayed, some of them were taken apart. They were found to be constructed as described in the indictment. Some of them were actually test fired. I was going to -- I was going to add that there were two quantities of explosive within each device. There was a propelling charge consisting generally of black powder or Red Dot which is a smokeless powder, and then the larger quantity of explosive which would detonate after the fuse had burned consisted generally of about three-and-a-half grams of flash powder which is an explosive. As I indicated, the ATF test fired a couple of the devices. They filled some rubber gloves with hamburger, fastened them to a block of wood and screwed the wood to a

23

plywood table they had constructed. They placed these hands around one of the devices and electronically detonated it from a distance. It blew the hamburger out of the hands. The block of wood which had been screwed to the plywood was blown several feet away and a large hole was blown in the plywood. They shot one of the devices from a single shot launcher at a fiberglass mannequin which was wearing a T shirt. The device broke through the shell of the mannequin to the inside of the mannequin, and after a short delay the secondary explosion blew the mannequin into several pieces. Based on all of the examination of the devices by the ATF, they do fit the description of a destructive device as that term is used in the statute; and therefore, they are firearms that need to be registered. That, if the trial had continued, the government would have presented that additional evidence.

THE COURT: All right. Thank you. Mr. Mock, I don't ask you to agree that those facts are necessarily are each true and -- but with that understanding, do you believe the government would have presented that evidence at the time of trial?

MR. MOCK: Yes. Yes.

THE COURT: All right. Mr. Everett, are you satisfied that Mr. Ways' plea of guilty is knowing, intelligent, and voluntary, and that there is a factual basis for it?

MR. EVERETT: I am.

THE COURT: Mr. Mock, do you want me to ask your client any more questions?

MR. MOCK: No.

THE COURT: Are you satisfied that his guilty plea is knowing, intelligent, and voluntary, and that there is a factual basis for it?

MR. MOCK: I am.

24

THE COURT: Mr. Ways, do you want me, again, to accept your guilty plea and the plea agreement?

THE DEFENDANT: If you would, sir.

THE COURT: All right. I do accept your guilty plea. I also accept the plea agreement and agree to be bound by it. I find that you're guilty plea is knowing, intelligent, and voluntary, and that there is a factual basis for it. I therefore find you guilty of Count II in paragraph 2 of the indictment. All right. That brings us to the issue of sentencing in this case, Mr. Ways. Your sentencing proceeding will take place on May 20, 2004, at 12:00 p.m. in this courtroom, at 12:00 noon in this courtroom. What's going to happen between then and now is that a presentence report will be prepared. It will be distributed to you and your lawyer and the government, and it will come to me, and that presentence report will help me at the time of sentencing. Is there anything further that we can take up at this time?

MR. EVERETT: No, Your Honor.

MR. MOCK: Your Honor, Mr. Ways has asked me to make a request that the Court reconsider allowing Mr. Ways to have pretrial release between now and his sentencing date so he may be able to dispose of his personal effects and resolve some personal issues related to the various businesses that he's involved in.

THE COURT: All right. What I would like you to do is file a written motion suggesting how that could be accomplished and in particular, whether there could be a third-party custodian to see that that could be done and when I have that in writing, then I can consider it more intelligently, and I'll want you, Mr. Mock, to visit with Mr. Everett about that before you submit it and visit with the Pretrial Service Officer so we don't go on this round robin thing about whether there is a dispute with Pretrial Services or a dispute with the government. If everybody is in agreement that the third-party custodian is reasonable, Pretrial Services may need to do an inspection. I don't know, but I would like that

25

done and represented to me in the form of a written motion so that I have the entire package so I don't have to be guessing about whether everybody is on board about this or whether there is a problem. I mean, if there is a problem, we can resolve the problem. I'm not obviously making any promises about what I'm going to do, but that makes the most sense to me. So I'll consider it when I have the motion that I have described with the work that I've required. Anything further, Mr. Mock?

MR. MOCK: No, Your Honor.

THE COURT: Mr. Ways, do you have any questions, sir.

THE DEFENDANT: No questions. I just had wanted that. I wanted to know if I could say something about the pretrial release.

THE COURT: Sure. Go ahead.

THE DEFENDANT: I have never been a flight risk. I mean, they have all the records of those, and the last judge, Piester, said on the stand that he didn't think I was a flight risk. Obviously, I already have a previous felony. That's why I'm a prohibited person, and I was given pretrial release, presentencing. I was told to turn myself in after they took the plea then, so I could put everything in order, and there is -- there are multiple corporations that need to either be condensed, transferred into other people's power, property that needs to be moved.

THE COURT: Sure.

THE DEFENDANT: Things of that nature, and I know that in today's world, there is nowhere anybody can go. You have America's Most Wanted. They are finding people from Nazi Germany who are 90 years old. My father is a retired Lincoln police officer with every accommodation an officer could have. He's doing prison ministries now. Pretrial seems to think because I disobeyed my father when I was 15 that he can't -- it's not a good location for me to be at almost 38

years old which seems disingenuous because no one is a same person as a teenager that they are as an adult. I know I can turn myself in. If I'm supposed to go to Yankton or Leavenworth, I would be there. I don't need another charge of failure to appear or being a fugitive from justice and having, you know, everyone in world with a badge looking to wrestle me to the ground and harass my mother and father and my brothers and sisters and my co-workers and friends. I mean, they are already faced with scrutiny for the mere fact that they either have my last name or know who I am.

THE COURT: Um-hm.

THE DEFENDANT: I don't think it's a giant request, and I don't think that pretrial release, the lady, Mindy Bare, cares one way or the other. She just says no. She believes for some reason that she was misled, and she wasn't, but that's her belief, and it seems to be following over for a year, and for a year, I haven't had a disciplinary action against me in any facility that I have been in. I haven't caused them a problem. I have tried to follow the rules. Up until the point where I made the plea, I had one belief, and I have done what I needed to do to move forward in life, but I would like to be able to take care of things. I have pets and other things that need to be moved and paperwork that people can't get to. The ownership papers, a variety of things that people won't be able to get to even if they had power of attorney because they are in places where they just won't have access to them.

THE COURT: Well, Mr. Ways, I'm perfectly happy to consider something anew.

THE DEFENDANT: And it would be the same. It would be at my father's residence.

THE COURT: Well, yeah. Without boring you with all the legal stuff, when an appeal comes to me from a magistrate judge's decision, I have got to review it in a certain way. When I'm originally presented with a motion, as would be now because we are at sentencing, I review it in a different way. What I have told Mr. Mock is that I want a motion

27

supported in the ways I have described. One of the things it seems to me that Pretrial Services may be able to tell you and the government may be willing, particularly given the machine gun thing, electronic monitoring during certain periods may solve a lot of our problems.

THE DEFENDANT: I assumed that would have been how it was normally done is that they had a bracelet on you. I thought that's what it would be from the first.

THE COURT:  Well --

THE DEFENDANT: I mean, I understand the ramifications if I didn't show up at 2:00 o'clock or wherever they told me to show up that I would be in a world of trouble, that the government would drop a bomb on me. I understand that, and I guess I'm trying to express that to you.

THE COURT: Well --

THE DEFENDANT: And that was a poor choice of words, but I guess the effect would be the same, you know.

THE COURT: You have got a good sense of humor, Mr. Ways.

THE DEFENDANT: I mean, what can I say?

THE COURT: I don't know. But here is what we are going to do. Mock is going to do -- what I suspect what I asked him to do, particularly ask about electronic monitoring, given the fact that the government would like to find out where in the world this machine gun is, it seems to me the government may have an interest, even though the plea of guilty has been accepted, in facilitating that under appropriate conditions, and perhaps we can get that done. I'm willing to consider this now that I'm handling the plea, so the process, I think, is this, Mr. Mock. You need to visit first with the government, get the specifics of what the government thinks it can live with, then you need to visit with Pretrial Services, particularly about electronic monitoring, and I presume they

have got to do, figure out whatever they have got to do about electronic monitoring, they have got to do a specific kind of investigation and then file the motion with that information, and if I think that it makes sense, I'm inclined to grant it. If I think it doesn't make sense, then I won't grant it. All right. Is there anything further we can take up? Mr. Ways?

MR. MOCK: There is nothing further.

THE COURT: All right. We stand in recess.

(Recess at 3:49 p.m.)

To the extent Ways attacks his plea and plea agreement because the prosecutor and his defense counsel allegedly deceived or threatened him, I find and conclude that he has failed to meet his burden. That is, no fundamental error occurred, and justice does not require relief.

Finally, although it is unclear given the writ of error *coram nobis* Ways seeks, it may be that a certificate of appealability is required because the writ he seeks is like a § 2255 motion. If so, I refuse to grant one. In this regard, a defendant cannot appeal an adverse ruling on a § 2255 motion unless he or she is granted a certificate of appealability. 28 U.S.C. § 2253(c)(1) & (2); Fed. R. App. P. 22(b)(1). The standards for certificates (1) where the district court reaches the merits or (2) where the district court rules on procedural grounds are set forth in *Slack v. McDaniel*, 529 U.S. 473, 484-485 (2000). I have applied the appropriate standard and determined that Ways is not entitled to a certificate of appealability.

IT IS ORDERED that:

1. The petition for a writ of error *coram nobis* (filing no. 2) is denied, *without prejudice*, to the extent it relates to Judge Bataillon's case, *United States v. Ways*, 8:12CR391.

2. The petition for a writ of error *coram nobis* (filing no. 2) is denied, *with prejudice*, to the extent it relates to my case, *United States v. Ways*, 4:03CR3046.

3. To the extent one is required, no certificate of appealability has been or will be issued.

4. A separate judgment will be entered.

5. The Clerk of Court shall send Mr. Ways a copy of this document and the Judgment.

August 17, 2020.

BY THE COURT:

Richard G. Kopf
Senior United States District Judge